UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| CHARLES M. KLEINSTEUBER, | |
| Plaintiff, | Civil No. 23-3494 (JRT/DTS) |
| v. | |
| METROPOLITAN LIFE INSURANCE COMPANY, | **MEMORANDUM OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT** |
| Defendant. | |

Denise Yegge Tataryn, **NOLAN THOMPSON LEIGHTON & TATARYN PLC**, 1011 First Street South, Suite 410, Hopkins, MN 55343, for Plaintiff.

Daniel Keenan Ryan, **HINSHAW & CULBERTSON LLP**, 151 North Franklin Street, Suite 2500, Chicago, IL 60606; Margaret Ann Santos, **HINSHAW & CULBERTSON LLP**, 250 Nicollet Mall, Suite 1150, Minneapolis, MN 55401, for Defendant.

Charles Kleinsteuber's wife Dana died in a tragic accident. While administering her own dialysis at home, something went wrong as she was ending her treatment, resulting in acute blood loss and eventually her untimely death. To compensate Kleinsteuber for his loss, his insurer, Defendant MetLife, paid out a life insurance policy but declined to pay out an accidental death and dismemberment policy. Kleinsteuber brought this action to recover the full benefit under the accidental death policy. Following the close of discovery, both parties moved for summary judgment. Because MetLife did not abuse its

discretion in interpreting a policy exclusion, the Court will deny Kleinsteuber's motion and grant MetLife's motion.

## BACKGROUND

Plaintiff Charles Kleinsteuber and his wife Dana purchased a group life insurance policy for Accidental Death and Dismemberment ("AD&D") from Defendant Metropolitan Life Insurance Company ("MetLife") through Charles's employer. (AR 3.)[1] The AD&D policy covered deaths caused by an "accidental injury" but contained the following exclusion:

> We will not pay benefits under this section for any loss caused or contributed to by:
>
> 1. physical or mental illness or infirmity, or the diagnosis or treatment of such illness or infirmity;

(AR 78.)

Dana Kleinsteuber was diagnosed with end-stage renal disease ("ESRD") in 2021 and shortly thereafter began self-administering home dialysis treatments. (AR 345, 428, 571, 977–83.)

On January 18, 2022, Dana began self-administering her in-home dialysis in the morning with plans to go to lunch with a friend immediately after her treatment. (AR 224, 291.) That morning, Charles had taken the dogs to the groomers and called Dana at

---

[1] (For all administrative record citations, see Bates numbers in the Administrative Record ("AR"), Feb. 14, 2025, Docket Nos. 22–26.)

11:25am to let her know he was on his way home. (AR 126.) Dana sounded normal during the call and told Charles she was about to finish her dialysis treatment. (*Id.*) Charles arrived home at 11:55am and found Dana lying in a pool of blood. (*Id.*) Dana said to Charles, "I think I may have killed myself," and "do not let me die," and initially told him not to call 9-1-1, apparently concerned that calling 9-1-1 might affect her chances at a transplant. (AR 125–26, 291.) But Charles eventually called 9-1-1 anyway, and first responders arrived at 12:23pm. (AR 125.) Though first responders attempted to administer life saving measures, Dana was pronounced dead by 1:08pm. (AR 125, 127–28, 245.)

Charles advised first responders and the medical examiner on the scene that Dana did not end her dialysis the right way, that she did not close her port on her right upper chest, and that she panicked when the dialysis machine set off alarms and dislodged her line while moving about. (AR 126, 245.) The Carver County Medical Examiner determined her cause of death was natural. (AR 249–50.) Dana's Death Certificate listed her immediate cause of death as ESRD and her underlying cause of death as natural causes. (AR 124.)

Charles's employer submitted both a life insurance claim and an AD&D insurance claim on his behalf and attached the Death Certificate and the police reports. (AR 142–52.) MetLife approved the life insurance claim but did not initially approve the AD&D claim. (AR 185–87.) When asked why the AD&D was not paid out simultaneously with

the life insurance, a MetLife employee stated by email that "When a death certificate has Natural causes as the manner of death, we do not review AD&D benefits." (AR 185.) But at Charles's request, MetLife formally reviewed the AD&D claim. (*Id.*)

A week later, MetLife issued an official letter denying the AD&D claim:

> The Minnesota Death Certificate we received states that Dana Kleinsteuber's death was due to "End Stage Renal Disease" and "Natural Causes". The manner of death was recorded as "Natural". The Police Report received from you states that Mrs. Kleinsteuber passed away following a medical emergency involving a dialysis machine.
>
> The Plan states that Accidental Death benefits are not payable if a loss is caused or contributed to by physical or mental illness or infirmity, or the diagnosis or treatment of such illness or infirmity. Here, the manner of the loss was not deemed accidental. Even if the loss was due to an accident, which was not the case, the loss was caused or contributed to by physical or illness or infirmity, or the diagnosis or treatment of such illness or infirmity with respect to Mrs. Kleinsteuber's renal disease.

(AR 196–97.) The letter also informed Kleinsteuber of his right to appeal the decision under the Employee Retirement Income Security Act of 1974 ("ERISA"), told him to submit additional documentation MetLife might need "to give your appeal proper consideration," and that, "[u]pon your written request, MetLife will provide you with a copy of the records and/or reports that are relevant to your claim." (AR 197.)

Armed with counsel, Kleinsteuber submitted a lengthy appeal letter, including various medical records, incident reports, photos, a declaration, and text exchanges. (AR 214–1054.) One of those records was a letter from Dana's physician, Dr. Kelly Flynn, who

-4-

stated that the Death Certificate she signed had improperly been used to determine Dana's death was not accidental: "Based on the information I have reviewed and Dana's medical records, I believe her death was caused by accident due to Dana's mistake of dislodging her port line and not caused or contributed to by her ESRD or treatment of ESRD." (AR 226.)

MetLife denied the appeal, again stating that the death was not accidental and that even if it were, the exclusion applied. (AR 1056–57.) But in addressing Dr. Flynn's letter, MetLife rested solely on the Plan's exclusion as a basis for the denial:

> The Plan exclusion referenced above is not limited to instances when a physical illness or infirmity is the direct cause of death but is also applicable in instances when a loss is caused or contributed to by the treatment of a physical illness or infirmity. Dialysis is a treatment for End Stage Renal Disease.
>
> . . .
>
> Had Mrs. Kleinsteuber not been receiving dialysis to treat her End Stage Renal Disease she would not have had a port line. Additionally, she would not have been interacting with a dialysis machine. Without the dialysis machine and port line the death of Mrs. Kleinsteuber as it occurred would not have been possible. Therefore, the treatment of her End Stage Renal Disease by means of dialysis caused/contributed to her death as it exposed her to the specific circumstances necessary for her to pass away as she did.

(AR 1057.)

Kleinsteuber then filed this ERISA action, asking the Court to award him the full AD&D benefit, plus interest and attorney's fees and costs. (Compl. at 13, Nov. 13, 2023,

-5-

Docket No. 1.) With the benefit of the full administrative record, both Kleinsteuber and MetLife moved for summary judgment. (Mots. Summ. J., Feb. 14, 2025, Docket Nos. 27, 32.)

## DISCUSSION

### I. STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Courts review a denial of benefits under 29 U.S.C. § 1132(a)(1)(B) de novo unless the policy unambiguously grants the administrator discretion in making claim decisions and in interpreting the terms of the policy, in which case courts apply an abuse of discretion standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111, 115 (1989). Under the abuse of discretion standard, an administrator's interpretation of a term will not be disturbed unless it is unreasonable. *King v. Harford Life & Accident Ins. Co.*, 414 F.3d 994, 999 (8th Cir. 2005) (en banc).

### II. ANALYSIS

MetLife now concedes that Dana's death was accidental, and the parties agree the abuse of discretion standard applies. Therefore, the only remaining question is whether MetLife abused its discretion in interpreting the Policy's exclusion as precluding coverage for Dana's death.

To determine whether MetLife abused its discretion in denying the claim, the Court must perform a two-step analysis, asking (1) "whether [the insurer's] interpretation of

the Plan language is reasonable," and (2) whether "application of that interpretation to the facts . . . is supported by substantial evidence." *Richmond v. Life Ins. Co. of N. Am.*, 51 F.4th 802, 806 (8th Cir. 2022).

### A. Reasonableness of MetLife's Interpretation

The Policy excludes coverage when "treatment" of a physical illness "contributed to" the insured's "loss." MetLife interprets that language to mean that a person who accidentally bleeds out from an open port during self-administered dialysis is excluded from coverage. The Court must determine if MetLife's interpretation is reasonable.

When determining reasonableness of an ERISA policy interpretation, courts in the Eighth Circuit apply the *Finley* factors:

> whether their interpretation is consistent with the goals of the Plan, whether their interpretation renders any language in the Plan meaningless or internally inconsistent, whether their interpretation conflicts with the substantive or procedural requirements of the ERISA statute, whether they have interpreted the words at issue consistently, and whether their interpretation is contrary to the clear language of the Plan.

*Finley v. Special Agents Mut. Benefit Ass'n*, 957 F.2d 617, 621 (8th Cir. 1992); *see also Ruessler v. Boilermaker-Blacksmith Nat'l Pension Tr. Bd. of Trs.*, 64 F.4th 951, 958 (8th Cir. 2023) (confirming courts in the Eighth Circuit should continue using the *Finley* factors). When an administrator has offered a reasonable interpretation, courts may not insert their own interpretation because under an abuse of discretion review, courts are not tasked with determining the "best or preferable interpretation." *Kutten v. Sun Life Assurance Co. of Can.*, 759 F.3d 942, 945 (8th Cir. 2014). However, courts must also

consider as a factor the conflict of interest created when a plan provides discretionary power to an insurer who is also liable to pay out benefits under the plan. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008); *Ruessler*, 64 F.4th at 958 (affirming that the conflict of interest is a factor to be weighed in the abuse of discretion evaluation).

To determine whether MetLife's interpretation is reasonable, the Court will evaluate each *Finley* factor, as well as the influence of a conflict of interest.

### 1. Factor 1: Consistency with Goals of the Plan

The first *Finley* factor asks whether MetLife's interpretation is consistent with the goals of the Plan.

The primary goal of an AD&D plan is "to provide an employees' benefit and welfare plan" for its members. *Finley*, 957 F.2d at 621. When paired with life insurance (as here), the goal is to "increase[] the amount of recovery over the face amount of the policy when death is from an accident." 10 Couch on Ins. § 139:1 (3rd ed. 2024). Covering the accidental port dislodgment would be consistent with the goal of providing Kleinsteuber with coverage above and beyond his life insurance policy. However, the focus here is on the interpretation of the exclusion itself.

Often insurers include exclusions to hedge against heightened risks such as medical procedures. *Cf. Boyer v. Schneider Elec. Holdings, Inc.*, 993 F.3d 578, 583 (8th Cir. 2021) (noting policy exclusions "temper[] the goal of providing accidental death benefits in order to preserve assets for those who do not engage in" certain risky behavior). "On the general theory that [medical] procedures amount to a heightening of the risk of injury

-8-

or death, insurers have traditionally been reluctant to provide insurance coverage for those adverse results." 10 Couch on Ins. § 141:77.  Such an exclusion allows the insurer to offer lower premiums than it would absent the exclusion, and the denial of coverage would serve the Plan's goal of hedging against the risk of medical procedures.  *See Boyer*, 993 F.3d at 583 ("A plan that provides accidental death benefits . . . need not pursue that goal to the exclusion of all others.").

Overall, this factor weighs slightly in favor of MetLife.

**2. Factor 2: Rendering Language in the Plan Meaningless**

The second *Finley* factor asks whether the interpretation renders any language in the plan meaningless.

Kleinsteuber argues that MetLife's interpretation of the exclusion renders the word "loss" meaningless by blurring the lines between a "loss" and the "accident."  In other words, he alleges MetLife improperly determined the dialysis caused the port dislodgment (the accident) rather than determining the dialysis caused the death itself (the loss).

But the record says otherwise.  The initial denial letter stated, "Even if the loss was due to an accident, which was not the case, the loss was caused or contributed to by . . . treatment of [physical] illness or infirmity with respect to Mrs. Kleinsteuber's renal disease."  (AR 197.)  Here, the phrase "the loss was due to an accident" necessarily indicates a distinction between the loss and the accident.  The follow up letter on appeal stated,

> The Plan exclusion . . . is not limited to instances when a physical illness or infirmity is the direct cause of death but is also applicable in instances when a loss is caused or contributed to by the treatment of a physical illness or infirmity. Dialysis is a treatment for End Stage Renal Disease.

(AR 1057.) Here, MetLife more clearly uses "loss" and "death" interchangeably. The Court is satisfied, having reviewed the record as a whole, that MetLife considered the "loss" to mean Dana's death, not the accident itself. MetLife's interpretation does not render the word "loss" meaningless, and this factor weighs in favor of MetLife.

### 3. Factor 3: Conflicts with ERISA's Substantive or Procedural Requirements

The third *Finley* factor asks whether MetLife's interpretation conflicts with any of ERISA's substantive or procedural requirements.[2]

By statute and regulation, ERISA sets out certain requirements for plan fiduciaries like MetLife "to provide claimants with sufficient information to prepare adequately for any further administrative review or for an appeal to the federal courts." *Brown v. J.B. Hunt Transp. Servs., Inc.*, 586 F.3d 1079, 1086 (8th Cir. 2009). MetLife need only take actions that are "substantively equivalent" to ERISA's regulations to give an insured a

---

[2] To analyze this factor, the Court must address Kleinsteuber's allegation that MetLife failed to conduct a full and fair review of his AD&D claim, as it was required to do under ERISA. Typically, plaintiffs allege a fiduciary's failure to conduct a full and fair review as a stand-alone claim, for which the remedy is remand for reconsideration. *See Brown v. J.B. Hunt Transp. Servs., Inc.*, 586 F.3d 1079, 1087 (8th Cir. 2009); *Hall v. Metro. Life Ins. Co.*, No. 13-3163, 2015 WL 5472551, at *14 (D. Minn. Sept. 16, 2015). But Kleinsteuber does not seek that relief; instead, he asks the Court to consider MetLife's alleged failure to follow ERISA's procedural requirements as one factor in an overall abuse-of-discretion determination.

meaningful opportunity to appeal a denial. *Cooper v. Metro. Life Ins. Co.*, 862 F.3d 654, 662 (8th Cir. 2017).

Kleinsteuber alleges MetLife failed to do four things. In its initial denial letter, MetLife allegedly failed to (1) explain the specific reasons for the denial and (2) provide a description of additional material needed to perfect the claim. 29 C.F.R. § 2560.503-1(g)(1)(i), (iii). During the appeals process, MetLife allegedly failed to (3) inform Kleinsteuber that he was entitled to all relevant information, and (4) consider all information he submitted with his claim. 29 C.F.R. § 2560.503-1(h)(2)(iii), (iv). The Court will take each alleged failure in turn.

First, MetLife adequately explained the specific reasons for the denial in its initial denial letter. In that letter, MetLife explained that the death was not accidental because Dana's Death Certificate listed her death as resulting from ESRD and natural causes. (AR 197.) It also stated that even if the death were an accident, the policy exclusion applied because the police report showed that Dana passed away from a medical emergency involving a dialysis machine. (*Id.*) MetLife complied with the regulation requirements in issuing its initial denial.

Second, it is less clear that MetLife provided Kleinsteuber with information on how to perfect his claim. ERISA requires a fiduciary to provide a "description of any additional material or information necessary for the claimant to perfect the claim and an explanation

-11-

of why such material or information is necessary." 29 C.F.R. §§ 2560.503-1(g)(1)(iii).  The letter includes a section titled "What you may do," in which it states,

> Please include in your appeal letter the reason(s) you believe the claim was improperly denied, and submit any additional comments, documents, records, or other information relating to your claim that you deem appropriate to enable MetLife to give your appeal proper consideration.
>
> . . .
>
> If you would like us to reconsider your claim, in support of your appeal, please include any pertinent documentation related to the claim which you believe will demonstrate the basis of your appeal.

(AR 197.)  MetLife's letter gets close to satisfying ERISA's perfection notification requirement, but it is not enough.  MetLife failed to inform Kleinsteuber with sufficient specificity how he may perfect his claim.

Third, MetLife informed Kleinsteuber he was entitled to all relevant information. In fact, MetLife's initial denial letter could not be clearer: "Upon your written request, MetLife will provide you with a copy of the records and/or reports that are relevant to your claim."  (AR 197.)

Fourth, both the initial denial letter and the follow up denial letter on appeal show MetLife fully considered the evidence Kleinsteuber submitted.  Kleinsteuber principally alleges that MetLife failed to address the only medical evidence in the record—that of Dr. Flynn—that ESRD treatment did not contribute to Dana's death.  But in its appeal decision letter, MetLife acknowledged Dr. Flynn's letter, accepted that it showed the death was an

-12-

accident, but responded that other evidence in the record showed that the policy exclusion still applied. For example, Kleinsteuber told first responders Dana had not ended her dialysis the right way and did not properly close her port. The Medical Examiner also noted that the circumstances of the death involved a dialysis patient whose tubes had come undone. Based on this additional evidence, MetLife concluded "that the death was related to Dana's interaction with a dialysis machine and Mrs. Kleinsteuber's chest port/port line which was used for dialysis." (AR 1057.)

Overall, the Court finds that the initial claims letter was at least somewhat defective in failing to articulate specific information MetLife needed to perfect the claim. But the corpus of MetLife's communications with Kleinsteuber was substantively equivalent to following ERISA's substantive and procedural regulations and fairly put Kleinsteuber in a position to cogently pursue his appeal. This is particularly so because, even now, it is unclear what else Kleinsteuber could have submitted that would have altered MetLife's analysis. The issue here was not one of lack of evidence—parties largely agree on the facts—it was merely one of interpretation. MetLife may not have provided clear direction on what information was needed to perfect the claim, but perhaps that was simply because there was nothing further Kleinsteuber could have provided that would change the outcome.

Accordingly, the Court finds that MetLife conducted a full and fair review and that MetLife's interpretation did not conflict with ERISA's substantive and procedural requirements. This factor weighs in favor of MetLife.

### 4. Factor 4: Consistent Interpretation

The fourth *Finley* factor asks whether MetLife has consistently interpreted this exclusion in this and other cases.

The Court finds MetLife has, in similarly situated cases throughout the country, interpreted the exclusion to apply to situations in which a botched treatment contributes to an insured's death. *See, e.g.*, *Wheeler v. Metro. Life Ins. Co.*, No. 1:11-603, 2012 WL 13005523, at *2, 4 (E.D. Tex. Sept. 10, 2012) ("[T]his accidental death was specifically caused by the treatment for an existing illness—elective surgery for her bladder incontinence."); *Rustad-Link v. Metro. Life Ins. Co.*, No. 13-111, 2014 WL 3956761, at *2–3 (D. Mont. Aug. 13, 2014) (MetLife taking the position that an exclusion applied when a mistakenly placed intravenous line to administer medication resulted in sepsis and eventual amputation).

MetLife has consistently taken the position that any accident related to medical treatment implicates this exclusion and so this factor weighs in favor of MetLife.

### 5. Factor 5: Clear Language of the Plan

The fifth *Finley* factor asks whether MetLife's interpretation defies the clear language of the plan.

-14-

Here, Kleinsteuber latches on to MetLife's assertion that the death was "related to" Dana's dialysis and that her dialysis "exposed her to the specific circumstances necessary for her to pass away as she did." (AR 1057.) Kleinsteuber says neither of these is the correct standard: the Plan specifically requires that dialysis "contribute to" Dana's death. But the Court need not resolve whether "related to" and "contribute to" are equivalents because several other portions of the denial letters use the "contributes to" language of the exclusion as the specific basis of denial. (AR 1057.)

This factor weighs in favor of MetLife.

**6. Additional Factor: Conflict of Interest**

Separate from the five *Finley* factors, the Court must also consider a conflict of interest as one factor in the overall analysis of whether the decision to deny the claim was reasonable. *Glenn*, 554 U.S. at 111. "A conflict of interest exists when a plan administrator holds the dual role of evaluating and paying benefits claims." *Manning v. Am. Republic Ins. Co.*, 604 F.3d 1030, 1038 (8th Cir. 2010). A conflict of interest is more important "where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration," and less important "where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." *Glenn*, 554 U.S. at 117.

Parties here agree that this case involves a conflict of interest because MetLife both interprets and administers the Plan. However, the record is slim as to the extent of that conflict. With no real facts in the record that demonstrate where on the spectrum of conflict cases this falls, the Court looks to other cases that have evaluated the conflict bound up in similar MetLife policies.

For example, another court in this district gave "a moderate amount of weight" to the conflict of interest plaguing a similar MetLife policy. *Hall v. Metro. Life Ins. Co.*, No. 13-3163, 2015 WL 5472551, at *11 (D. Minn. Sept. 16, 2015). But in *Hall*, the Court emphasized certain aggravating factors. For example, MetLife used an internal medical director to evaluate the claims in the case rather than an outside doctor, that medical director's opinions were "cursory" and initially hidden from the insured, and MetLife's reasons for denying the claim shifted erratically throughout the claims process. *Id.*

Kleinsteuber holds up *Hall* as an example of a case where the conflict should weigh against denial. But there is little evidence that Kleinsteuber's claim process suffers from the same defects that were present in *Hall*. It is true that MetLife both evaluates and pays out claims. But there was no hidden, biased evidence evaluated in this claim—MetLife cites only to the same reports to which Kleinsteuber has access and even directly responds to Dr. Flynn's letter in denying the appeal. And unlike in *Hall*, MetLife has maintained from the first denial letter that the Plan's exclusion barred it from paying out the claim.

Because the conflict of interest here does not appear to be quite as impactful as the conflict in *Hall*, the Court will give minor to moderate weight to the conflict-of-interest factor here.

\*   \*   \*

Overall, the *Finley* factors point strongly toward MetLife's interpretation of the Plan as being reasonable. The Court has considered the minor to moderate effect of the conflict-of-interest factor, but that conflict does not outweigh the *Finley* factors' firm indication that MetLife's interpretation was reasonable.

Therefore, so long as there is substantial evidence to show that Dana's dialysis treatment contributed to her death, MetLife did not abuse its discretion in denying Kleinsteuber's claim.

### B. Substantial Evidence

The only remaining question is whether the record contains substantial evidence of Dana's dialysis contributing to her death. The Court is satisfied that it does.

The record shows that Dana received dialysis treatment for ESRD. (AR 345.) The record also shows that Dana was self-administering dialysis on the day she died. (AR 291.) During that treatment, she told her husband on the phone that she would soon be wrapping up her dialysis. (AR 126.) But shortly thereafter, her husband came home to find Dana lying in a pool of blood. (*Id.*) Dana said to Charles, "I think I may have killed myself." (*Id.*) Charles told first responders that Dana did not end her dialysis the right way, that she did not close her port on her right upper chest, and that she panicked when

-17-

the dialysis machine set off alarms and dislodged her line while moving about.  (*Id.*; AR 245.)  Dana ultimately died of acute blood loss.  (AR 226.)

Kleinsteuber argues that the record is insufficient in two ways.

First, Kleinsteuber argues this evidence is not enough to show that the dialysis itself contributed to Dana's death because the record is mixed on whether Dana had turned off her dialysis machine by the time of the accident.  But that fact is not dispositive.  Even if the machine itself were switched off by the time of the port dislodgment, removing tubing and closing off catheters is part and parcel of dialysis treatment.  "Contributed to" is quite broad language, and MetLife has put forward substantial evidence that the dialysis process as a whole contributed to the loss of life, not just the accident itself.

Second, Kleinsteuber argues that even if the treatment did contribute to Dana's death, the causation is too remote.  As many courts have recognized, it is not enough under this exclusion for the treatment of a condition to cause an accident that in turn causes a death.  Rather, the treatment must itself directly contribute to the death.  *See, e.g.*, *Kellogg v. Metro. Life Ins. Co.*, 549 F.3d 818, 832 (10th Cir. 2008) ("Here, the loss (Brad Kellogg's death) was caused by a skull fracture resulting from the car accident, not by physical or mental illness.  While the seizure may have been the cause of the crash, it was not the cause of Brad Kellogg's death.") (citations omitted); *Orman v. Prudential Ins. Co. of Am.*, 296 N.W.2d 380, 382 (Minn. 1980) (finding the exclusion did not apply when an aneurism caused a person to lose consciousness, fall in the shower, and drown, because

"the aneurysm may have contributed to the accident, but it did not contribute to the death").

But here, the administrative record contains substantial evidence that the connection between the treatment (dialysis) and the cause of death (acute blood loss) is much more direct than it was in the deaths in *Kellogg* and *Orman*. Dana's dialysis did not merely cause the accident, as the seizure caused a crash which in turn caused the skull fracture in *Kellogg* and the aneurysm caused the fall which in turn caused a drowning in *Orman*. The botched dialysis treatment, with no intervening steps, directly contributed to the acute blood loss itself.

This application matches what most other courts have determined when considering whether AD&D policies cover accidents that occur during the course of surgeries. *See, e.g.*, *Wheeler*, 2012 WL 13005523, at *4 (anoxic injury during bladder suspension surgery); *Thomas v. AIG Life Ins. Co.*, 244 F.3d 368, 369–70 (5th Cir. 2001) (sutures burst during stomach-stapling surgery); *Senkier v. Hartford Life & Acc. Ins. Co.*, 948 F.2d 1050, 1051, 1054 (7th Cir. 1991) (migrating catheter punctured heart during Crohn's Disease treatment). It is also consistent with *Hall*, in which the treatment itself (blood-thinners) exacerbated the injury that flowed from the accident. *See Hall*, 2015 WL 5472551, at *16 (remanding on other grounds).

Overall, the Court finds that MetLife has put forward substantial evidence that Dana's dialysis treatment contributed to her death and accordingly that the Plan's exclusion applied. MetLife did not abuse its discretion in denying Kleinsteuber's claim.

## CONCLUSION

Dana Kleinsteuber suffered a tragedy while administering her own dialysis at home. MetLife now agrees that tragedy was an accident. But MetLife did not abuse its discretion in determining that the dialysis treatment contributed to Dana's death, which triggered a policy exclusion. Therefore, the Court must deny Kleinsteuber's Motion for Summary Judgment and grant MetLife's Motion for Summary Judgment.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that

1. Plaintiff's Motion for Summary Judgment [Docket No. 32] is **DENIED**.

2. Defendant's Motion for Summary Judgment [Docket No. 27] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: August 19, 2025                             s/John R. Tunheim
at Minneapolis, Minnesota.                            JOHN R. TUNHEIM
                                                  United States District Judge